BUSINESS MEN'S ASSURANCE COMPANY OF AMERICA
*v.* BURKS.

Opinion delivered May 7, 1928.

*M. F. Elms,* for appellant.
*W. A. Leach,* for appellee.

SMITH, J. Appellee, Ray O. Burks, was formerly the owner of a tract of land in Arkansas County, and, while such owner, procured a loan of several thousand dollars from the Fidelity Land Credit Company, and, as security therefor, gave a mortgage on the land. The notes evidencing the indebtedness and the mortgage securing them were sold and assigned to appellant, Business Men's Assurance Company of America, hereinafter referred to as the company. The loan contract required that insurance against the hazards of fire and windstorm be maintained on the buildings on the land and that a standard mortgage clause in favor of the holder of the mortgage be attached to the insurance policy.

On February 25, 1924, appellee Burks sold and conveyed the land to Aner Nearhood, a resident of the State of Iowa, and thereafter, on or about March 5, 1924, an insurance policy was procured on the buildings protecting against fire and storm, to which was attached a standard mortgage clause in favor of the company. At this time Nearhood was the owner of the land and the buildings thereon, but, through mistake, the insurance policy was made payable to appellee Burks, instead of to the owner, Nearhood.

The residence on the land, one of the buildings insured, was destroyed by fire, and the insurance company denied liability on the policy which it had written, and a lawsuit resulted. On March 7, 1927, a decree was rendered in favor of Nearhood and the company for $1,500, the face of the policy, with penalty, interest and costs, and the amount thereof was later paid to appellant's attorney, who had successfully conducted that litigation.

The sale of the land to Nearhood by Burks was not a cash transaction, but involved an exchange of Iowa lands for the Arkansas lands, all of which were incumbered, and the grantors exchanged their respective equities. Litigation arose out of this transaction, and Nearhood brought suit in Iowa against Burks, who retaliated by bringing a suit in Arkansas against Nearhood.

Pending this litigation, and by way of compromise thereof, Burks negotiated a sale of the Arkansas land to Mrs. Carrie A. Phillips, which was finally consummated by the execution of a deed from Nearhood to Mrs. Phillips. Burks and Nearhood each dismissed his suit against the other. Mrs. Phillips imposed as a condition to her purchase of the Arkansas land that Burks rebuild the residence thereon, and this he did.

On November 18, 1925, Burks wrote a letter to the company advising that the residence had burned, and that, through the error of making the policy payable to him instead of to Nearhood, the insurance company had denied liability, and it was stated that the assistance of the company might be required to collect the policy. This letter contained the following statement: "Would like very much to use the insurance to build another house on the place, and want to know if this will be satisfactory if we would build a house back that would cost much more than the insurance. The amount of the insurance is $1,500."

In reply to this request the company wrote a letter, under date of November 21, 1925, which contained the following statement: "It will be entirely agreeable to us to have the proceeds of the insurance in its entirety used for the replacement of the house. We, however, suggest that we want to take the same course that we would if we were collecting the insurance for the purpose of retaining the same, but we will make the proceeds of the insurance available to meet the expense and cost of the new improvements as the bills in connection therewith accrue."

On November 23, 1925, Burks answered the letter of the 21st from the company, in which he explained the mistake in the issuance of the insurance policy, which letter concluded with the following statement: ''Thanking you for your willingness to allow the entire amount to go back in the new building.''

Prior to January 4, 1926, the company received a letter from Nearhood in regard to using the insurance money in rebuilding the residence, and on January 4, 1926, the company wrote Burks as follows: ''We have indicated our willingness to carry out the same arrangement with said present owner that we indicated we would do with you. However, as you are the maker of the paper which we hold, we do not want to act in this matter in any way that would disturb your responsibility to us as such maker, and will appreciate hearing from you authorizing the use of the proceeds of the insurance as is contemplated.''

Burks answered this letter under date of January 9, 1926, as follows: ''Answering your favor of January 4, regarding the insurance on the property that I was the maker of the loan on, in your company's favor. It would be perfectly satisfactory to let the insurance go to Mr. Elms, attorney for the present Aner Nearhood. Thanking you for calling my attention to this, and assure you it will be all right to let the proceeds go as outlined.''

The company wrote a letter to Burks advising that the policy had been sent to Nearhood's attorney for collection, and on January 15, 1926, Burks, answering this letter, stated: ''It is perfectly all right for you to send this insurance policy to Mr. Elms, as he represents Mr. Nearhood, and is going to sue the company, if necessary, to collect the insurance. The trouble with the insurance is that it was made out in my name through error of the agent here, and the land had already been transferred to Aner Nearhood. They are trying to get out of paying the insurance on this technicality. I do not believe they can do it, but in all probability he will have to sue them to get the premium. It will be all right to apply this

premium on the indebtedness when collected, or allow Mr. Nearhood to build a house instead.''

Relying upon this correspondence, Burks rebuilt the residence, and, on March 19, 1927, advised the company that he had done so, and inclosed a fire insurance policy on the new building in the sum of $1,600. This letter also advised the company that the cost of the new building was $2,100, and had been fully paid for, and that the materialman would so advise the company. In addition to the residence, a barn and garage had also been built at a cost of a hundred dollars. This letter referred to the former correspondence, and requested the company to direct the attorney who had collected the judgment against the insurance company to pay the writer the amount of the insurance on the old building.

In answer to this letter the company wrote, under date of March 25, 1927, as follows: ''We presume that Mr. Elms will be remitting us for the fire loss shortly, and, when received, will be handled in accordance with our understanding covered in our correspondence concerning the same.''

A letter of even date was written by the company to the attorney, in which it was stated that: ''There is no intention on our part to default in our promise heretofore made in this connection. What we must be certain about is who paid for the building of the new dwelling. The J. I. Porter Company have written us that the house built on the SW¼ of 34-3-5, at the contract price of $2,100, has been paid for in full, both as to material and labor, and that the house is now occupied by a tenant. We prefer that the fire loss when collected be remitted to us and we will account for it as hereinbefore stated, and I think this method of handling it will, or should, be satisfactory to Mr. Burks. I assume that the judgment you have obtained is in our favor, as you have represented us in bringing the suit.''

When the attorney had shown Burks the last-mentioned letter, as he was directed to do, Burks sent a telegram inquiring about his money. In reply to this tele-

gram the company answered and reviewed the correspondence, which was interpreted by the company as giving the company the right "to elect as to applying the proceeds of the fire loss to our loan on the property, or apply it to the rebuilding of a dwelling." The letter also called attention to the fact that the value of the security had depreciated since the mortgage loan was made, and that the property had been acquired by a lady, who was a nonresident of the State and who was in possession of the farm by a tenant, thus making the loan less desirable. The following proposition was then submitted: "If the sum of $750 of this fund be lodged with us as additional security to the loan (your note), you to retain the balance, and when the loan is paid or reduced from its present sum to the extent of $750 we will pay over to you the sum deposited as collateral. * * * This tentative proposal is made subject to the approval of our loan committee, which approval I feel justified in assuring you can rely upon will be forthcoming when your acceptance of same is in hand, and you may exhibit this letter to Mr. Elms for his guidance so far as our interests are concerned."

Upon receipt of this letter Burks brought this suit and made the attorney a party defendant, and prayed that the attorney be enjoined from paying over the insurance money to the company, and that he have judgment for the amount of the insurance, less any sum due the attorney as a fee for collecting the insurance.

It was stipulated that nothing was past due or unpaid to the company on the principal debt and that the interest thereon had been fully paid.

Upon this record the court rendered a decree in favor of Burks against the company for the sum of $1,500, and directed the attorney to pay that amount of the insurance money to Burks, and this appeal is from that decree.

It is not questioned that, under the mortgage clause in the insurance policy making it payable to the mortgagee as its interest might appear, the company had the

right to collect the proceeds of the policy and apply the same to the mortgage debt; but the testimony set out above very clearly shows that it waived this right by agreeing that Burks might apply the amount of the face of the policy to the building of the new residence, which is of course subject to the lien of the mortgage. The security of the company has not therefore been impaired. But it would be immaterial if it had been, as the correspondence set out above shows very clearly that Burks relied upon the promise of the company in advancing the money to rebuild the residence, and the company could not thereafter impose other or additional conditions.

It is said that the company wished to protect itself from the possible assertion of liens of any character against the building and, as a means to that end, reserved the right to settle with the materialmen and laborers, but this contention is answered by saying that in the agreed statement of facts it is recited that Burks has paid in full all bills of every character. It is immaterial therefore that the company was not allowed to pay these bills, as they have in fact been paid. It was further stipulated in the agreed statement of facts that the new building is of less value than the one destroyed, but the amount of this difference was not shown. However, that fact is immaterial, as Burks' original proposition was not to erect a building of greater value than the old one was, but that he would build a house which would cost more than the insurance, and the agreed statement of facts shows that he did this.

The decree of the court below accords with principles of equity, and it is therefore affirmed.